IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PS DATA SERVICES, INC., } <br> } <br> Plaintiff, } <br> } <br> vs. } <br> } <br> KANE STEEL & IRON, LLC, } <br> } <br> Defendant. } <br> ──────────────────────── } <br> } <br> KANE STEEL & IRON, LLC, } <br> } <br> Counterclaim Plaintiff, } <br> } <br> vs. } <br> } <br> PS DATA SERVICES, INC.; and } <br> PAUL SIVAK, } <br> } <br> Counterclaim Defendants. } | Case No.:  2:07-CV-0127-RDP |

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

Pending before the court is Plaintiff's Motion to Dismiss Defendant's First Amended Counterclaim (Doc. # 20) filed on June 13, 2007. The motion has been fully briefed and came under submission on July 2, 2007. For the reasons set forth below, the court finds the motion is due to be granted.

**II.   THE COUNTERCLAIMS AT ISSUE**

On February 8, 2007, Kane Steel & Iron, LLC ("Kane Steel") asserted a counterclaim and complaint for declaratory judgment against PS Data Services, Inc. ("PS Data") and Paul Sivak ("Sivak") alleging fraud, breach of contract, trespass, intentional interference with a business

relationship, copyright infringement, and co-ownership of the source code. (Doc. # 6). PS Data had originally filed this lawsuit against Kane Steel on January 17, 2007. (Doc. # 1). On June 12, 2007, PS Data filed its First Amended Counterclaim, which supplements its prior claims, adding allegations of PS Data's violation of the Federal Computer Fraud and Abuse Act, Electronic Communications Privacy Act, and common law invasion of privacy. (Doc. # 19). Sivak and PS Data's motion seeks dismissal of two of Kane Steel's counterclaims: a claim under the ECPA, 18 U.S.C. § 2510, *et seq*. (Count IX); and a separate claim for invasion of privacy under the common law of Alabama (Count X). (Doc. # 20).

### III.   STATEMENT OF RELEVANT FACTS[1]

Plaintiff and Counterclaim Defendant, PS Data, is an Ohio company with its principal place of business in Middletown, Ohio. (Doc. # 6 ¶ 2). Defendant and Counterclaim Plaintiff, Kane Steel, is an Alabama limited liability company with its principal place of business in Birmingham, Alabama. (*Id*. ¶ 1). Counterclaim Defendant, Paul Sivak, is the sole owner and operator of PS Data and is alleged by Kane Steel to have personally engaged in all of the wrongful conduct asserted in the counterclaims. (*Id*. ¶ 4).

In 1999, Sivak represented to Kane Steel that he could provide a "turn-key" computer system that included Steel Distributors Software ("SDS"). (*Id*. ¶ 7). Sivak represented that SDS was specifically designed to assist steel dealers in managing all of the day-to-day activities of the

---

[1] Generally, when deciding a motion to dismiss, the court must "accept all well-pleaded factual allegations in the complaint [here, the counterclaim,] as true and construe the facts in a light most favorable to the non-moving party." *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (citing *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)). From their submissions addressing Plaintiff's Motion to Dismiss, the court has gleaned the parties' agreements regarding the facts that are relevant for purposes of this motion only, and has relied upon those unless otherwise noted.

company, including inventory management, invoicing accounts receivables, and accounting. (*Id.*). Based upon Sivak's representations, Kane Steel hired PS Data to install SDS. (*Id.*). According to Kane Steel, within six months after its purchase of SDS, it realized that SDS could not handle the operational needs of a steel dealer because it did not invoice properly, generate the correct reports, distinguish common transactions within the steel industry, nor perform necessary accounting functions. (*Id*. ¶ 8).

Kane Steel presented a list of these defects to Sivak in September 1999; Sivak replied that he could repair the defects and make SDS fully operational for less than what it would cost Kane Steel to purchase a new system. (*Id*. ¶ 9). Sivak also warned Kane Steel that he had left "bombs" in the systems of other customers that were activated if they refused to pay for his services. (*Id.*). Thereafter, Kane Steel paid PS Data for Sivak to repair the defects in SDS and to redesign SDS to better satisfy the operational needs of Kane Steel. (*Id.*).

Kane Steel hired Ellen Sullivan in December 1999, and she assumed local responsibility of Kane Steel's computer systems. (Doc. # 22 Ex. 1 ¶ 4). Ellen Sullivan referred to herself as a "Network Administrator." (*Id.* Ex. 1 ¶ 5).

PS Data agreed to provide Kane Steel with the SDS source code and subsequently downloaded the source code on Kane Steel's files. (Doc. # 6 ¶ 11). As SDS was redesigned by Sivak and Kane Steel employees, the source code was updated. (*Id.*). Sivak instructed Kane Steel employees on how to download copies of the source code for safe-keeping. (*Id.*). Kane Steel downloaded a copy of the source code according to Sivak's instructions and stored a copy of the source code in its fire safe. (*Id.*). The only copy of the source code in existence is currently in Kane Steel's counsel's possession. (*Id.*).

During the following seven years, Kane Steel alleges that the software failed to perform in a reasonable manner, which caused many problems for Kane Steel's day-to-day business operations. (*Id.* ¶ 12). Kane Steel expended time, effort, and resources to assist Sivak in locating and resolving problems with the software. (*Id.*). Because Kane Steel was required to modify, adjust, repair, and maintain the software to ensure its proper functioning, Kane Steel alleges that the software, as it exists today, is the product of the joint efforts of Kane Steel and Sivak. (*Id.* ¶ 13).

In addition to representations about SDS, Sivak also represented to Kane Steel that he could provide "turn-key" computers with all of the necessary software needed to operate Kane Steel's business. (*Id.* ¶ 16). Despite these representations, the PS Data software did not live up to Kane Steel's expectations. (*Id.*). Kane Steel began looking for replacement software and information technology services and engaged a third-party to audit its network. (*Id.* ¶ 17). The audit found many defects with the software provided by PS Data. (*Id.*). Moreover, the audit also revealed that PS Data was potentially engaging in software piracy and was attempting to sell Kane Steel unlicensed copies of the software by way of his "turn-key" computers. (*Id.* ¶ 18). As a result of the concerns raised by the audit and PS Data's alleged failure to provide proof of licensing, Kane Steel purchased new software. (*Id.*).

During this time, Kane Steel began considering a replacement steel broker software system. (*Id.* at ¶ 19). Sivak learned about Kane Steel's plans through information found on Kane Steel's computer system files and e-mails. (*Id.* ¶ 19). On or around November 8, 2005, a "pop-up" licensing agreement was added to Kane Steel's system. (*Id.* at ¶ 20). This was allegedly done by Sivak without Kane Steel's knowledge. (*Id.* ¶ 20). On or about January 8, 2006, the licensing agreement added by Sivak was allegedly revised to enhance the position of Sivak with regard to the

software rights, again without Kane Steel's knowledge or authorization. (*Id*. ¶ 22). According to Kane Steel, the licensing agreement does not accurately reflect any agreement between the parties. (*Id.*).

On January 12, 2006, Justin Kane of Kane Steel met with Sivak to discuss the problems with the software and to demand Sivak provide proof of licensing for the software. (*Id*. ¶ 23). On January 17, 2006, Sivak allegedly deleted the SDS source code located on Kane Steel's system, along with other items. (Doc. # 22 at p. 4). According to Kane Steel, Sivak was the only person who knew where the source code was located on Kane Steel's system. (Doc. # 6 ¶ 21). On January 19, 2006, the source code reappeared on Kane Steel's system without permission or authorization of Sivak or PS Data. (Doc. # 22 at p. 4). That day, Sivak contacted Kane Steel requesting that the source code not be accessed by anyone other than PS Data and stating that the situation would "turn real ugly." (Doc. # 6 ¶ 24).

On or around May 1, 2006, counsel for Sivak sent correspondence to Kane Steel asserting ownership of the source code and claiming that Kane Steel intended to divulge the source code to third parties to facilitate copyright infringement. (Doc. # 6 ¶ 24). For the first time, Sivak also asked Kane Steel to sign a Non-Disclosure Agreement for Steel Distribution Software. (*Id.*). On or around May 4, 2006, counsel for Kane Steel sent correspondence to counsel for Sivak confirming a previous oral agreement entered into by counsel for both parties, wherein both parties agreed not to file a lawsuit against the other until there had been a reasonable period for negotiation so that the parties could resolve the dispute amicably or without resort to the judicial process. At that time, Kane Steel also assured Sivak that it would not disclose or transfer the source code. (*Id*. ¶ 26).

5

**IV.   STANDARD OF REVIEW**

PS Data has challenged the sufficiency of Kane Steel's Amended Counterclaim under Federal Rule of Civil Procedure 12(b)(6), which provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). A court may dismiss a complaint (or a portion thereof) under Rule 12(b)(6) if a plaintiff fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombley*, 127 S. Ct. 1955, 1974 (2007). That is, if a plaintiff (or, as in this case, a counterclaim plaintiff) "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.*

In deciding a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the complaint as true and construe the facts in a light most favorable to the non-moving party." *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (citing *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)). "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003) (quoting *Marsh v. Butler County*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc).

Further, "[a] complaint may not be dismissed because the plaintiff's claims do not support the legal theory [it] relies upon since the court must determine if the allegations provide for relief on *any* possible theory." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (emphasis in original) (citing *Robertson v. Johnston*, 376 F.2d 43 (5th Cir. 1967)). Nevertheless, conclusory allegations, unwarranted deductions of facts, or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d

1182, 1188 (11th Cir. 2002); *see Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) ("[A] plaintiff must plead specific facts, not mere conclusional allegations, to avoid dismissal for failure to state a claim. We will thus not accept as true conclusory allegations or unwarranted deductions of fact.") (internal citations omitted); *Kirwin v. Price Commc'ns Corp.*, 274 F. Supp. 1242, 1248 (M.D. Ala. 2003) ("[A]lthough the complaint must be read liberally in favor of the plaintiff, the court may not make liberal inferences beyond what has actually been alleged."), *aff'd in pertinent part*, 391 F.3d 1323 (11th Cir. 2004).

## V.  ANALYSIS

PS Data has sought to dismiss only Counts IX and X of the counterclaim, which allege, respectively, violations of the Electronic Communications Privacy Act of 1986 ("ECPA") and common law invasion of privacy. The court will address in turn each count of the counterclaim that PS Data seeks to dismiss.

### A.  Electronic Communications Privacy Act of 1986

The principal purpose of the Electronic Communications Privacy Act of 1986 ("ECPA"), which amended federal wiretap law, was "to extend to electronic communications the same protections against unauthorized interceptions that [wiretap law] had been providing for oral and wire communications via common carrier transmissions." *Brown v. Waddell*, 50 F.3d 285, 1289 (4th Cir. 1995); *see also U.S. v. Steiger*, 318 F.3d 1039, 1046 (11th Cir. 2003). The body of electronic surveillance legislation created by the ECPA breaks down into three statutes: the Wiretap Act, the Pen Register statute, and the Stored Communications Act ("SCA"). The Wiretap Act and Pen Register statute, which comprise Title I of the ECPA, regulate prospective surveillance of Internet connections (communications "in transit"), and the SCA, which comprises Title II of the ECPA,

governs retrospective surveillance (stored communications).  *U.S. v. Steiger*, 318 F.3d at 1046–47.

  **1.**  **Title I**

According to 18 U.S.C. § 2511(1), the Wiretap Act generally prohibits the intentional "interception" of "wire, oral, or electronic communications."  *U.S. v. Steiger*, 318 F.3d at 1047.  "Interception" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  The circuits that have interpreted this definition as applied to electronic communications have held that it encompasses only acquisitions that are made *contemporaneously* with transmission.  *See e.g., Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir. 2002); *U.S. v. Smith*, 155 F.3d 1051, 1057 (9th Cir. 1998); *Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 460 (5th Cir. 1994).

The *Steiger* decision, the controlling Eleventh Circuit case on this issue, follows prior case law holding that an acquisition during "flight" is required to implicate the Wiretap Act with respect to electronic communications.  The term "flight" refers to a contemporaneous interception, *i.e.*, a seizure or interruption while in progress or course before arrival.  *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 630 (1985).  The judicial interpretation of the ECPA's provisions declares that "Congress did not intend for 'intercept' to apply to 'electronic communications' when those communications are in 'electronic storage.'"  *Steiger*, 318 F.3d at 1048.  This interpretation narrows the definition of the term "intercept" so that it refers solely to an acquisition contemporaneous with transmission.  *Id.*

Therefore, for a claim to survive under Title I of the ECPA, any interception of an electronic communication must be contemporaneous with transmission of that communication.  In this case,

Kane Steel does not deny the provisions set forth in Title I of the ECPA but rather suggests that such an "intercept" did in fact occur.  (Doc. # 21 at p. 3).  Nonetheless, Kane Steel's one use of the word "intercepted" in its counterclaim, is placed within a string of alternative possibilities.  (Doc. # 19 ¶ 22).  The following language appears in Kane Steel's First Amended Counterclaim at paragraph 22: "Sivak and PS Data intentionally intercepted, used, and/or disclosed (and/or endeavored to do so) Kane Steel's electronic communications in violation of 18 U.S.C. § 2701 *et seq.*"  Because this allegation is the only reference to interception, and because it is placed with other alternative theories in a *pro forma* recitation, the court finds that this allegation is too speculative to satisfy the *Twombley* standard as to the interception element of Title I.  Moreover, there are no factual allegations that support Plaintiff's theory that any retrieved email was the product of an "in-flight" or "contemporaneous interception."

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."

*Twombley*, 127 S. Ct. at 1964–65 (internal citations omitted).  "[B]ald [legal or factual] assertions will not overcome a Rule 12(b)(6) motion."  *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (citation omitted).

Kane Steel's Title I claim lacks the substance *Twombley* requires in order to survive a motion to dismiss because the allegations on which that claim rests are little more than legal conclusions couched as facts.  Because Plaintiff has not met its pleading burden, the motion to dismiss Kane Steel's ECPA Title I claim is due to be granted.

**2.     Title II**

As previously stated, Title II of the ECPA is more commonly referred to as the Stored Communications Act. Congress has prohibited "intentionally access[ing] without authorization a facility through which an electronic communication service is provided; or intentionally exceed[ing] an authorization to access that facility; and thereby obtain[ing], alter[ing], or prevent[ing] authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a) (2006). While courts have observed that the general purpose of enactment of the SCA in 1986 was to create a cause of action against computer hackers and electronic trespassers,[2] the case law that has developed since the passage of the SCA has not been expressly clear as to the scope of those privacy interests that are actually protected by the statute.[3]

The SCA provides varying levels of protection to the content of electronic communications, depending upon whether the content is held by an electronic communication service, in electronic storage, or by a remote commuting service. *See* Deirdre K. Mulligan, *Reasonable Expectations in Electronic Communications: A Critical Perspective on the Electronic Communications Privacy Act*, 72 GEO. WASH. L. REV. 1557, 1568 (2004); *see also* 18 U.S.C. §§ 2711(1) & 2; 2510(15) & (17) (2006). In light of these varying levels of protection, it is helpful to analyze the Title II issue in this case in two parts. The first part addresses whether Kane Steel's network qualifies as a electronic communication service. The second examines the nature of the information held on that network

---

[2]*See Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F. Supp. 2d 817 (E.D. Mich. 2000).

[3]At least two courts of appeal have noted that "the intersection of these two statutes is a complex, often convoluted, area of the law." *Steiger*, 318 F.3d at 1047 (quoting *Konop*, 302 F.3d at 874). Much of this confusion arises from the fact that these statutes predate the ubiquity of the Internet. *Id.*

to see if it is protected. This dual analysis of Kane Steel's allegations demonstrates that Title II can afford Kane Steel no relief.[4]

### a. The Network: Does Kane Steel Provide Electronic Communication Services?

At least one district court has held that the SCA does not apply to electronic communications held by a private company that does not provide electronic communication services to the public as part of its actual business, *e.g.*, an employer that stores employee email on its servers. *See Andersen Consulting, LLP v. UOP*, 991 F. Supp. 1041, 1042–43 (N.D. Ill. 1998) (interpreting 18 U.S.C. § 2702(a)). Although not binding upon this court, the court finds the decision persuasive. In *Andersen*, Defendant UOP's internal e-mail system was separate from the internet; similar to Kane Steel, UOP had to purchase internet access from an electronic communication service provider, as it did not independently provide internet services. *See id.* at 1043. The *Anderson* court found that the SCA did not protect electronic communications held by UOP, because it did not provide electronic communication services to the public. *Id.* at 1042–43.

The district court in *In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001) further defined the term "electronic communication service" to apply to internet service providers ("ISP") and telecommunication companies, which provide the means upon which Internet communications travel. 154 F. Supp. 2d at 511 n.20. Similarly, in *Steiger*, the Eleventh Circuit stated that Title II of the ECPA "clearly applies, for example, to information stored with a phone company, ISP, or electronic bulletin board system ("BBS")." 318 F.3d at 1049. A service provider

---

[4] Because these parts are both necessary, the failure of Kane Steel to show either one would lead this court to dismiss the Title II claim. This court examines both parts in the alternative for the sake of clarity and thoroughness, not because both are required to resolve the issue.

can only be an electronic communication service if it provides another with the ability to send or receive electronic communications. 18 U.S.C. § 2510(15) (2006). *See also In re Jetblue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299 (E.D.N.Y. 2005) (holding that an "electronic communication service" does not include operators of commercial web sites that provide traditional products and services over the Internet, as opposed to Internet access itself, notwithstanding the fact that such web sites have email capabilities enabling operators to communicate with their customers). Kane Steel has failed to allege that it provides any type of electronic communications service, nor has it alleged any facts that would give rise to this inference. Accordingly, for this independent reason, Kane Steel's Title II claim against PS Data must fail.

> **b.     The Information: Is the Information that Kane Steel Alleges to Have Been Taken Electronic Communications in Electronic Storage?**

Alternatively, although Kane Steel alleges in its brief that its employees' communications constitute "electronic communications" as defined by § 2510(12) and that its computers constitute "electronic storage" as defied by § 2701 *et seq*., judicial and legislative interpretations of these terms do not support Kane Steel's position. According to the statute, "[e]lectronic [s]torage" means: (a) any temporary, *intermediate* storage of a wire or electronic communication incidental to the electronic transmission thereof; and (b) any storage of such communication *by an electronic communication service* for purposes of backup protection of such communication. 18 U.S.C. § 2510 (17) (2006) (emphasis added). Several courts have found that subsection (a) applies to information stored temporarily on an ISP's server pending delivery. *See, e.g.*, *Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004); *In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 511–12 (S.D.N.Y. 2001); *Fraser v. Nationwide Mut. Ins. Co.*, 135 F. Supp. 2d 623, 635–36 (E.D. Pa. 2001);

*cf., Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 461–65 (5th Cir. 1994) (addressing messages stored on an electronic bulletin board system pending delivery). Of particular interest, one court has noted that the SCA

> is specifically targeted at communications temporarily stored by electronic communications services incident to their transmission-for example, when an email service stores a message until the addressee downloads it. The statute's language explicitly refers to "temporary, intermediate" storage. Webster's Dictionary defines "temporary" as "lasting for a limited time," and "intermediate" as "being or occurring at the middle place...." Webster's Third New International Dictionary 2353, 1180 (1993). In other words, Title II only protects electronic communications stored "for a limited time" in the "middle" of a transmission, i.e. when an electronic communication service temporarily stores a communication while waiting to deliver it.

*DoubleClick*, 154 F. Supp. 2d, 512. Kane Steel has not claimed that the communications it alleges were improperly accessed were awaiting transmission. Only information in transitory storage falls within the electronic storage provisions of the SCA. Therefore, Kane Steel's allegations do not satisfy *Twombley's* standard.

Kane Steel has cited *Theofel* for the proposition that "some courts have observed that the SCA applies to the unauthorized access of servers." (Doc. # 21 at p. 5). However, upon review, *Theofel* is distinguishable because it did not involve an internal server similar to Kane Steel but rather e-mail stored by a plaintiff's ISP's server. 359 F.3d at 1071. The SCA applies to an ISP's servers because they are part of an electronic communications service and because of the nature of the information they contain. It is not the presence of servers that brings a network under the SCA–it is the nature of the network and the information contained in the network that leads to the protection of servers.

For these alternative reasons, PS Data's motion to dismiss Count XI of the First Amended Counterclaim, alleging a violation of Title II of the ECPA, is due to be granted.

**B.     Invasion of Privacy**

Count X of the Defendant's First Amended Counterclaim asks this court to entertain a claim of invasion of Kane Steel's privacy. As both parties acknowledge, Alabama has neither recognized nor refused to recognize a cause of action for invasion of a corporation's privacy. Out of respect for the sovereign power of Alabama to decide which causes of action it will allow under its laws, this court elects not to proceed on this claim.

Accordingly, this court declines to exercise supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(c)(1), which gives this court discretion to decline to exercise supplemental jurisdiction over claims that raise "a novel or complex issue of state law." *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (stating that "[d]epending on a host of factors, then-including the circumstances of the particular case, *the nature of the state law claims*, *the character of the governing state law*, and the relationship between the state and federal claims-district courts may decline to exercise jurisdiction over supplemental state law claims" (emphasis added)). Principles of comity dictate that federal courts should not exercise supplemental jurisdiction where a state has not had the opportunity to resolve unsettled questions in its own law, especially where, as in this case, there is no pressing need for the federal court to engage the novel issue.[5] *See Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1549-50 (11th Cir. 1993). This court

---

[5]Most commonly, federal courts decline to exercise supplemental jurisdiction when all federal claims have been dismissed; however, the United States Supreme Court has noted that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial. . . the state claims should be dismissed as

aims to express no opinion whatsoever on the viability of a claim seeking damages for the invasion of a corporation's privacy in Alabama, and thus it will dismiss the claim. However, this dismissal is without prejudice. 28 U.S.C. § 1367(d) (2007). The parties are free to seek relief from an Alabama court of proper jurisdiction.

## VI.   CONCLUSION

As explained above, the court concludes that PS Data's Motion to Dismiss the Amended Counterclaim (Doc. # 19) is due to be granted. Specifically, the court grants PS Data's motion to dismiss Count IX of the counter-claim, involving both Title I and Title II of the ECPA. Furthermore the court declines to exercise supplemental jurisdiction over Count X, alleging invasion of privacy, and therefore dismisses that Count. The court will enter a separate order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this ___20th___ day of September, 2007.

_____
R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

well." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966). It is a mistake to focus solely on the second sentence, which tells what a district court should "certainly" do, and to ignore the first, and more permissive, sentence. After Count X is dismissed, the counterclaimants will still have a substantial remedy available for the conduct complained of in Count X.